All right, ready? May it please the Court, my name is Norm James with Fenimore, Craig, and Phoenix, and my clients today are the National Association of Home Builders, the Southern Arizona Home Builders Association, and the Home Builders Association of Central Arizona. Let me begin, Your Honor, or Honors, by inquiring whether I should address the Rule 54B issue that came up. Very briefly, we did file briefs on it. As I had indicated in the briefs, I think, in part, I have to take responsibility for inadvertently creating confusion. We don't believe, the home builders do not believe, that Rule 54B certification was necessary because there are simply no claims pending before the district court. Well, didn't the district court retain jurisdiction of the substantive claims? Your Honor, the district court retained very limited jurisdiction. In fact, they made an order just a few weeks ago, right, in that part of the case. She issued a procedural order relating to the deadlines, Your Honor, for the redesignation of the critical habitat. And the court can't issue a procedural order unless it has jurisdiction over a case, can it? There are no claims, though, Your Honor, that are currently unadjudicated. The purpose of Rule 54B, Your Honor, is to ensure that the court, among other things, isn't faced with piecemeal appeals, where you have multiple. Well, you say there's nothing. She's remanded the habitat. It's got to come back, is it not? See, critical habitat, Judge Newman, will be redesignated sometime later this year, yes. And that's part of the case. But, Your Honor, there's no claim yet pending relating to the redesignation of critical habitat. Well, Your Honor, we didn't bring up half the case in the sense that there were – again, if I can, if I may, Your Honor. I think our case would say, you know, that a remand is not a final judgment. Right. Well, the issue – again, there are two distinct rules that were challenged. There was the rule listing the species, listing the population, and then there was a rule promulgated two years later designating critical habitat. The critical habitat rule was set aside by the district court. That judgment became final with respect to that rule. There was no appeal taken. The district court has subsequently certified – and let me just proceed with the I apologize for stumbling here. It seems to me we have one of two situations. Either as Judge Tashima and Judge Newman, as you have suggested, either we have a situation where because the court – the district court retained limited jurisdiction to address the issue – to address the remand of the critical habitat, that Rule 54B certification was needed before this court could address the listing rule appeal. The district court has issued a new Rule 54B certification. What about – with respect to that issue, what about the point raised by the government that, well, there's a question whether the district court had jurisdiction to issue a second 54B certification? In other words, whether it loses jurisdiction after issuing the first certification, whether or not it's, you know, it's sufficient. Well, I think the problem with the government's point, Your Honor, is it would place the case in judicial limbo. If we either – At least until the habitat is – Well, and also, I mean, maybe perhaps the most – the proper way to proceed would have been by limited remand so that the district court, to the extent your notice of appeal gave us jurisdiction and divested it of the district court, the district court can't just start issuing orders. There has to be some remand of jurisdiction from us to them so that they would have jurisdiction to issue an order concerning this part of the case. Well, I think, again, the point I was trying to get at in Judge Wardline talking about judicial limbo is if the initial Rule 54B certification was proper, then this court would have jurisdiction. It would be improper for the district court to take any action with respect to the claim on appeal. However, if the initial Rule 54B certification was not proper because it left out the key language, no just reason for delay, then, in effect, this court wouldn't have had jurisdiction and the district court – and there are cases, in fact, that are cited by the government indicating that the district court does retain the limited power to go back and fix the certification or to issue a certification initially to ensure that this court has appeal. Well, the Kirsch case says do an initial one. The Kirsch case doesn't say that it could fix one that was defective. I mean, it seems to me that having this defective certification in front of us, that we would have to dismiss the appeal. But Your Honor, in my view, with all due respect, that would be illogical because, again, there are no claims pending before the district court. In other words, if we were back in front of the district court – But the critical habitat claim is – although it was remanded, it's coming back. So in a sense, it is pending. It's coming right back. She retained jurisdiction over it, or he. Your Honor, there's no – Well, I think you're mixing up the two issues. You know, one, do you need a certification? Now we're discussing whether the certification is adequate. That's true, Your Honor. Now, with respect to the latter question, you see, the reason for, you know, the division between – on jurisdiction between the trial court and the appellate court is that I think as a practical matter, common sense or the division is made that, you know, the district court can't go about amending the very orders that are under question on appeal. Otherwise, you could never have a, you know, a sensible appellate process and get to judgment. So if you follow that rule, it doesn't make sense to permit the district court to amend the 54B certification. At the very moment, it's under question. In other words, how can we rule on it? You know, I mean, suppose the government went back and got another certification. It's a moving target. But if – but again, and this was the point – just to address the latter point, and I think, Judge Wardlaw, this was also the point you were driving at. If we – if the case is remanded back to the district court, all that would happen would be the district court would issue the same – very same order. Well, maybe it would and maybe it wouldn't. Maybe it would say, well, maybe I'll have to wait until we, you know, finish the critical habitat. I mean, who knows? Well, that's the point. I mean, we can't assume that. Well, but I think you can, though, Judge Tachim, with all due respect, because, again, the district court, when we pointed out to the district court that this issue existed, she immediately acted and issued a revised certification, which – which – Did she have a hearing, Your Honor? No, she didn't, Your Honor. She refused to do it. It was a – She refused to do it. It was a final question. We – we copied – it was done on an emergency basis, Judge Nunez. Did you let it ex parte? No, we didn't do it ex parte, Your Honor. We copied everybody. In fact, the – you'll see the – the filing was attached to the government's supplemental brief. We – we wrote a letter to the judge. We copied all counsel. It was not done ex parte, Your Honor. Did you prepare the order? We prepared the order, but the judge – the district court judge actually modified the order and issued her own order. Well, can I ask you about the – page 2 of the order, the first paragraph – full paragraph? Certification is appropriate based on the nature of the court's ruling, which effectively decided plaintiff's challenges to both the listing rule and the critical habitat designation. Please tell us how it effectively decided the challenge of the critical habitat designation. Because the critical habitat order, Your Honor, that was promulgated in 1999 was set aside. There is no critical habitat for the pig meowing. Well, but it has decided it and sent it back for decision. But it – it set – well, no, Your Honor, it set the – the judgment, the final – the court's final order, the judgment that was issued on December 13. In fact, I believe the – the September 21, 2001 order vacated and set aside the rule. It set aside, but it's not going to – isn't it going to be decided now by the service? The service will issue a new rule because they're – But it hasn't effectively decided anything. Yes. It's just sent it back for further proceedings. The legal effect, Your Honor, was to eliminate critical habitat. I think I just disagree with that statement, and I find it rather amazing that you have the judge's assignment. Well, Mr. James, you're familiar, are you not? I assume you are, with the – you know, with the cases and this and other circuits that when a district court remands a matter to an administrative agency, that's not a final judgment. Are you familiar with those cases? Well, if the judge – if the judge determines, Your Honor, that a rule is invalid in orders that it's set aside, I would – I would believe that is a final judgment. I didn't say that. I said if the district court – I don't think I said that. I apologize. Remands a case, right, to the administrative agency for further consideration, that's not a final judgment. Well, I'm not familiar with those cases, Your Honor. I'm just basing – I'm basing my argument today on what happened in the district court below. Well, that's what happened, isn't it? One of the – Remand to the agency for further consideration. One of the issues below, Your Honor, was what should happen with this rule, and the judge – the judge set the rule aside. The rule is no longer in effect. The agency has to promulgate a new rule. Well, all right. All right. Let me ask another question. Judge Bolton issued this first order remanding the critical habitat determination in September 2001, and here we are, March – no, wait. Yes, March 2003. Right. Where is this – where is – what is the status of the critical habitat determination? The critical habitat determination, I think – and we touched on this in our supplemental brief, Your Honor. The critical – there is a proposed rule published in November in the federal register. It's cited in our brief. And have you commented on that? No, the comment period, Your Honor, isn't going to close until now, April 25, 2003. The current schedule is that there will be a new rule published in the federal register, I believe, on or about September 25. Does it look like a good rule to you? No, it does not, Your Honor. But again, it's a proposed rule. We haven't commented on it. So it's a different rule than the other rule. But it is conceivable that even if the DPS designation stood up, that the critical habitat determination that ultimately is decided would be something that your clients might not necessarily want to object to. That's certainly possible. That is conceivable. So in a sense, to go back to why are we hearing this now, if the critical habitat determination ended up in such a way that whatever property it is that your client is concerned about, this whole case might go away. That's exactly right, Your Honor. The – you don't list critical habitat for a species until the species is placed on the list. Right. So from the standpoint of looking at whether it's – it promotes judicial economy, to hear this appeal now as opposed to remanding it and then making everybody wait until there's eventually a new critical habitat rule, what should be in effect doing is leaving the listing in place, causing injury to landowners and resource users until the time that a new critical habitat rule comes out and there may or may not be any challenges to the new critical habitat rule. Well, Mr. James, why do you say that's customary when the statute says it's to be done concurrently? Well, I honestly can't answer that, Your Honor, because – Can we follow the statute? Your Honor, all we reported to you in our brief is the fact that roughly a third of the species that are listed have critical habitat designated. Now, there is an exception. Concurrently. Yes. Well, I believe roughly 65 percent of the species on the list that are listed as threatened or endangered do not have critical habitat. At all? At all. And again, I think in effect we're being – we're being punished in effect because the Fish and Wildlife Service hasn't been doing its job. I'm not here advocating, Judge Noonan, that they shouldn't be designating critical habitat. All I'm saying is that this – right. This is a – that this happens. There is frequently critical habitat is not designated concurrently with the listing. All right, Mr. James. You know, I think we know your position now on the appellate jurisdiction. You have about six and a half minutes left. Maybe you can tell us something about your position on the merits. Thank you, Your Honor. Yes. Very briefly, given my limited amount of time and I would like to save a couple minutes for rebuttal, let me make it clear what's on appeal and what's not on appeal. We view the appeal, which again relates solely to the listing decision, and if we're right on appeal, the critical habitat issue becomes moot. All we're arguing on appeal is whether the Fish and Wildlife Service complied with its policy, the DPS policy adopted in 1996 following formal rulemaking procedures, establishing the criteria under which a population of animals may be treated as a species and therefore be subject to listing. The issue is very narrow. We're not challenging the DPS policy or the criteria in the policy. We're not arguing that a population of animals that are rare in the U.S. but common in a foreign country can't be listed. All we're saying, Your Honors, is that in this particular case, the Fish and Wildlife Service violated its own policy by treating the Arizona pig male population as a distinct population segment, as a listable entity. Because it didn't meet which factors for the DPS? Well, I think, Your Honor, in view of my time, I want to jump to the most obvious violation and that's the second. There's a two-part test, discrete and significant. Discreteness means the population is separate. It can be delimited by a geographical barrier or, in this case, by the international border. Are you still maintaining the argument that the international border is an inappropriate consideration for the FWS to have accounted for? No, Your Honor, we're not. And again, this is, I think, what got the district court confused. We're not saying that it was inappropriate to consider the international border. What we were saying was that the test in the policy was not satisfied with respect to the border. We didn't think that there was evidence in the administrative record demonstrating that the test for discreteness was satisfied. But if I may, because I'm very short on time. Get to the significance and the gap. The significance is really the key point, Your Honor, because that is the part of the DPS policy that really implements the Congress's intent that the ability to designate populations and treat them as species be used sparingly. To determine significance, once you've carved out the population, or in this case we have a map, I passed a map out, showing the range of the species. It's a bit distorted, but it's there really just for illustrious purposes. Once you carve out the population and you say, this group is distinct, it's separate, it's in a different mountain range, it's geographically isolated, it's isolated by virtue of the border, the next test, the significance test, focuses on the significance of the population to the taxon, to the species as a whole. And clearly in this case, that wasn't done. The district court, at oral argument, recognized that once the species in southern Arizona was separated, was carved out as a distinct population, all that happened was the agency compared Texas and Arizona. They never looked at the significance of the taxon, of the population, excuse me, to the taxon as a whole. And that is the critical part of the test, as the DPS policy indicates. I suppose we agree with you, and we remand this listing to the FWS as well. Can't they just rewrite the finding and say, I mean, just looking at this map, it looks significant, it looks about 15%. Can't they just articulate what basis they have and just rewrite it? And then it would be fine? Well, whether they can or not, I mean, whether they can or not, that's what they should be required to do. I mean, it's, again, this is also just basic administrative law. They have a policy that their claim is entitled the Chevron deference. They haven't followed it. If it's remanded back to the agency, Your Honor, yes, they could go back and attempt to make a correct finding of significance. They could look at the Arizona population and compare it and explain its significance, which they haven't done to the taxon as a whole. But why should we go through that exercise if the underlying data that's included in the plan or the rule contains information from which we could extrapolate significance? Your Honor, I think, okay, and I apologize, I wasn't quite following you. The record today doesn't contain that information. That's the simple answer. Because, again, once the Arizona population was separated, the agency didn't do the analysis, didn't do the investigation it was required to do. So the record doesn't contain the evidence that you refer to, Your Honor. Well, what kind of data is necessary to make that analysis that you claim is not in the record? For instance, what, percentage? No, I think it's... Numbers of birds or what? What data is missing? I think it's, well, I think it's the requirements set forth in the task for significance. If there, would it result in a significant gap in the taxon's role? I know that, but what, you say that the data is not there to make that analysis. I want to know what data that is. You're just telling me what the factors are that need to be analyzed. Your Honor, well, again, Your Honor, you're asking me to, in effect, I'm sort of having to prove a negative here. I don't know what data is out there because the Fish and Wildlife Service made no attempt to comply with that, with the significance requirement under the test. What is out there, Your Honor, I don't know. But they would, they have to have some amount of data. I'm not asking you what's out there. I'm asking you what kind of data is required to support that finding. Like, for instance, what? They would have to show, they would have to have data showing, for example, that loss of the Arizona population would result in a significant gap in the range of the taxon. Looking at the entire taxon. Let me ask you this then. Is the question of significance of the range, is that a question of law? I mean, a matter of interpreting that regulatory policy? Well, Your Honor, I think the issue of whether they complied with the two-part test, I think is, in effect, an issue of law, or at least an issue of mixed fact in law. But this case was decided on cross motions for summary judgment. I think all the parties have agreed. The government has said that this is de novo review before this Court. Again, we're not asking you to, and this is another key point, we're not asking you to second-guess the agency. But this isn't a case, Your Honor, where we have conflicting views of experts. We have one scientist saying that there are genetic differences, another scientist saying there aren't. There is simply a vacuum, Your Honor, and that's the basic problem here. I can't tell you as I stand here today what data precisely is missing, because in part, since the investigation wasn't done, the data's not in the record. The comparison in the record on significance is Texas versus Arizona. Your Honor, I apologize. I've used up all my time. I'd hoped to reserve some for rebuttal. Well, we took up a lot of your time on the jurisdiction issue. We'll give you two minutes for rebuttal, all right? Thank you very much, Your Honor. Good morning. May it please the Court. Excuse me. My name is Jeff Cahan. I'm representing the Secretary of the Interior. By the way, are you both going to argue? Yeah, I was going to introduce my gentleman. My co-counsel is Mr. Mike Senatore. He's representing the Defenders of Wildlife, the interveners in this case. And I'd like to reserve to him at least eight minutes. That's fine. We'll see. I would like to talk about the merits of the case also, unless... Well, what's your position? Just tell us as briefly as you can. What's your position on appellate jurisdiction? It's the government's view that under this Court's fairly strict interpretation of Rule 54B, that this Court does not have appellate jurisdiction, but that this was, in fact, a – that technically it doesn't have appellate jurisdiction, but that this case was, in fact, eligible for separating the judgments, the remand from the judgment in the listing rule and certifying this case. Is it your view that this is a case in which a 54B certification is required? Yes. Go ahead. Okay. The merits of this case involve whether the Fish and Wildlife Agency, which is an expert in wildlife conservation, was reasonable to list the Arizona pygmy owl because it was an important population that's readily identifiable to the two prongs of the DPS policy and is in danger of extinction within Arizona. The – and the record shows that it is, in fact. Notwithstanding opposing counsel's view that the information just isn't there, the Fish and Wildlife Service looked at the – what documentation there was of the pygmy owl in Arizona, Texas, Western Mexico. What is the – what documentation is there of the significance of the Arizona population to the taxon as a whole? I guess that's the key question, right? Well, that is correct. That is one of the key questions. The – in our brief, we pointed out that it is significant for a couple of different reasons. One, there's potential for marked genetic differences between regional populations. Now, we're just going to stop you right there.  But the regulation says there has to be an actual market. That doesn't meet the regulatory requirement, does it, to say there's a potential? Well, the requirement of the policy is that there be a – that in order to conserve genetic diversity, that the agency may find that a population is significant because it would leave a gap in the range of the population or – that it will result in a reduction of genetic – in the genetic variation of the species. Now, that's if the – in the policy, the words are that the – that there is evidence that the discrete population differs markedly. It doesn't say that it needs to be conclusive evidence. No, but it has to differ markedly, which means, first of all, it has to be actual as opposed to potential. And that difference has to be marked. Now, all that – you know, all that the agency found was that there was a potential. It didn't say there was, you know, a marked distinction. That doesn't meet the regulatory requirement, does it? Well, I would argue that it does because the Fish and Wildlife Agency is required on the basis of the Endangered Species Act and on the basis of the DPS policy to look at the available evidence. It's not a requirement that the Fish and Wildlife Service go out and genetically test different regions, say, to go and see whether the birds that live in the desert, which are the ones in Arizona versus the ones who live in deciduous forests in Mexico or the ones that live in tropical forests, are genetically different. If the information is there, as it has been for some species, which have been of more – I don't know the answer. You know, how is the usual determination made as to whether there's a marked genetic distinction? Is that just by visual observation? Well, there's a correspondence – Or actually do some kind of a DNA analysis. Well, where the DNA analysis is available, the Fish and Wildlife Service does look at it.  Well, the Fish and Wildlife Service doesn't do that much research. It depends on the research of academics and the general scientific understanding of species. Because of the large number of species and because the Fish and Wildlife Service has its hands full with just listing the species, it has to depend upon commercial and scientific sources of information, which is what it has done here. It seems to me at times, at least, that the word species is used in a kind of unscientific way in these cases. Well, you're correct, Your Honor. The term species in the Endangered Species Act, as Congress understood it, was to include both species, subspecies, and discrete population segments. And it's well understood that distinct population segments is not a scientific term. It's a term that Congress came up with, as the legislative history shows, in order to allow the Fish and Wildlife Service to list parts of species which are in danger where the rest of the species may not be, or where the information, as here, is inconclusive as to the rest of the range of the species. What's a distinct population if it's not a scientific term? Who goes out and does the work on that? Is it just visual observation or what? Well, it's the same sort of scientific or commercial information that the Fish and Wildlife Service would look to in listing a species, an entire species or an entire subspecies that is generally recognized taxonomically by the scientific community. Here, they're listing a portion of the population, which is a subunit created by Congress of the subspecies, the cactus foraginus pygmy owl, which the appellants have provided a map of the historic range for us, which is from the record. And what kind of data went into that map? Well, the kind of data that went into the map was historic sightings of pygmy owls, collections of pygmy owls that were done by amateur and professional ornithologists at the turn of the 20th century. There were sightings. The Fish and Wildlife Service discarded some findings, which they felt were not sufficiently supported by the evidence, but they also focused on the man who originally shot the first pygmy owl, identified it and named it. They depended upon the... Not being actually killed it or photographed it? No, shot. Most of the information we have about pygmy owls from 100 years ago is from the standard means of identifying the owls was to shoot them and then skin them and stuff them, and they currently rest in the drawers of universities such as Berkeley and also in the Smithsonian Institution in Washington, D.C. So there's little doubt that this species actually existed in central Arizona. Now it exists only... It exists up to 100 miles into Arizona in a span nearly over 100 miles wide, and that's from Oregon Pipe Cactus National Monument to Tucson and down to the border. This is a very large part of the range of the pygmy owl, particularly when you focus on the fact that these are the owls that are adapted to life in the desert, whereas the record shows that the owl is much more common in the southern latitudes, say in the states of Tamaulipas or Tamaulipas, I'm not sure how to pronounce it, in eastern Mexico or in the states of Sinaloa, Michoacan, and western Mexico. Can you determine whether there's a percentage amount of significance based on the map or based on any other data that I might find in this policy? The significance finding is in the judgment of the Fish and Wildlife Service looking at the entirety of the information they looked at. Right, but there has to be some certain data facts from which the FWS draws a rational connection to its conclusion, and what I'm trying to look at is did the policy just not articulate it well and the data's in there to support the rational conclusion, or is the data missing? The Fish and Wildlife Service has its own, just as lawyers do, has its own jargon, and perhaps that's sometimes a little off-putting when reading these notices, but the information is, in fact, in the record. Well, what is it? Can you list it? And I assume that you say it wasn't clear from the policy, you mean from the listing rule. It's not clear from reading what was written. So, you know, and the question is, if we send it back, are you going to take the same data and write it better, and if that's correct, okay, well, what is the data that's supporting it? The data is that there is this potentiality of a genetic difference based on the marked differences in the regional populations, looking at physically the exterior of the birds. When you say regional, you're comparing east versus west or the DPS versus southern Mexico? No, if they had meant east versus west, they would have said between the distinct population segments. Instead, they mean between the different regions in which the owl inhabits. So difference between desert, deciduous forest, and tropical forest. Okay, go ahead. For purposes of the significance analysis, does that include the Mexican population? Yes. Okay. Yeah, the Fish and Wildlife Service acknowledges that it's very important to look at what information there is. And, in fact, there's over 100 pages in our Supplemental Excerpts of Record and much more in the Administrative Record about the owl in Mexico. But the Fish and Wildlife Service determined that, based on that, it looks like there are very few owls in Sonoran Desert in Mexico or the United States, but that it's unclear from southern Mexico whether they are common. They appear to be locally common, as shown by the Audubon Society's annual Christmas bird count down in southern Sonora and northern Sinaloa, that in a few spots they may be common. But more information is needed before they could be listed in Mexico. I'm sorry. But the Fish and Wildlife Service did take the entirety of the information that was available about the Cactus Phrygianus pygmy owl and looked at whether the population in Arizona was important to the subspecies as a whole. They found that it was, based on these differences. Based also on the fact that there would be left a significant gap in its range. We mentioned in our brief that it's not just a gap in its historic range, but its current range. The owl has a widespread distribution throughout southern Arizona. It used to have an enormous range within Arizona, relative to what it is now. But, even just taking the current range, this is important because these are the desert owls. They occupy southern Arizona, northern Sonora. So when looking at the entire length, it may seem that because there's 1,200 miles where the owls have been sighted over the last 120 years, that the part, the 100 miles by 100 miles that's in southern Arizona is not that significant. But, in fact, if that were eliminated, that would leave a large gap, as we said, in its range. And we compared it to the end effect. When you say large, what are you speaking of? Significant. No, I mean large in terms of, you know, square miles or what? Well, it's large in terms of the population. It does happen to be large in terms of square miles. But the essential part of this is that it's large in terms of the types of birds represented in the species. As the Fish and Wildlife Service said in its distinct population segment policy, the intent of the... How can it be large in terms of the number of birds when, you know, they're... I mean, it's common in southern Mexico, right? Well, the evidence seems to point to that. But, as the Fish and Wildlife Service found, it was inconclusive. Well, if it's common in southern Mexico and there's just only a few in Arizona, how can it be large in terms of number of birds? I may have misspoken. I don't mean that it's a large number of birds in Arizona. There were 19 at the time of the listing. There may be as many as 40. It varies from year to year. Last year was a drought year. There were 18 of them. But it's not in terms of the number of birds, the X percentage of birds disappear, and therefore that's a large part, a large portion of the population. Well, what is it? Significant in terms of what? It's in terms of the importance of this population to the subspecies, and whether this is a significant gap is related to whether it will eliminate, as the distinct population segment policy stated, whether it will undermine the goal, the interrelated goals of conserving genetic resources and maintaining natural systems and biodiversity of a representative portion of their historic occurrence. If these owls disappear from southern Arizona and the record shows that they are exceedingly rare or nonexistent in northern Sonora, that is indeed a significant representative habitat. There's a significant representative portion of those owls that were adapted to living in that desert habitat. And because that part in Arizona is within the jurisdiction of the United States, So you're saying that the habitat in which this particular subspecies exists is different from the habitat in which it thrives in the rest of Mexico, and that's why it's significant, because it develops differently genetically and is needed to, your co-counsel says I've got it right. But is that what it is? Yeah, that is in large part, because the reason it has significance and discreteness is that it lives in a different, it lives in different habitats. It lives in one habitat in Arizona. It lives in a number of habitats in Mexico. The record shows that in the habitat that crosses the border, it's quite rare. In the habitat in southern Sonora, Sinaloa, Michoacan, and so forth, those forests, the owl appears to be common. And the genetic characteristics of the pygmy owl in the Arizona habitat is important to the development of the owl in other parts? Is that what you're saying? Important to preserve the range of genetic variation. Preserve the range of genetic variation. I mean, we cited the yellow-legged frog rule in footnote 13 of our brief. And that's a case where private scientists had, in fact, gone out and done genetic testing and so forth. But that stands not so much for the fact that you need genetic testing as the background issue that peripheral populations are not, as the home builders allege, meaningless to the rest of the population. They allege that this is an expanding and contracting population. But we've shown that the owls have lived here, have been permanent, and are reproducing, but that they're declining because of loss of their habitat. It's not that this is simply fluctuations in range, and I do need to preserve time. Why is it important to preserve the genetic range of a species? Well, there's a couple ways to answer that. The first way to answer that is that that is what the Endangered Species Act was meant to do. It's part of the policy behind the Endangered Species Act, is to retain the range. It's acknowledged that the species will lose habitat in the United States. But the goal of the Endangered Species Act is to preserve representative habitat, to preserve the genetic diversity that was found in the United States, what they call the natural heritage of this nation. Okay. Thank you very much. You haven't left much time for your co-counsel. You've got about 2.40. I'm going to give your opponent a couple extra minutes, so we'll give you some time. Five minutes, all right? Thank you, Your Honor. Would you like me to quickly address the 54B issue? Just state your position. If you have something different from the government. We have a slightly different position from the government. We believe that the judgment the district court rendered with respect to the listing in critical habitat rules, both were a final judgment. From our standpoint, what's critical there is the fact that the critical habitat rule was not simply remanded. The designation was actually set aside. Therefore, from our standpoint, our only opportunity, had we been so inclined, to actually appeal that decision would have been to have appealed that decision. Once we've got a new critical habitat rule in place, obviously that's a completely different rule. Our opportunity, therefore, to appeal the district court's prior decision on the critical habitat rule, from our standpoint, could have only been appealed at that standpoint. With respect to the 54B certification itself, our position is that it's technically deficient. We did not have an opportunity to submit anything to the district court on the supplemental certification. I question whether that certification is even sufficient. It's got, I think, it's got the proper wording, but I question whether or not there are actually specific findings to support that finding. You got notice of this one day that they were asking for that? We got notice after, apparently, they had already contacted the judge's chambers, and the new proposed order was submitted. Well, was it before it was issued, or what? It was before it was issued. I actually did not actually get the facts from the appellants until, I believe, the day after it was actually submitted, which I think was the same day the court actually signed the order. So you had no opportunity to be heard on it? I'm not sure exactly when the court, at what time the court signed the order, but if we had, as the government did, the government actually was able to submit something that day. My understanding is that the order was signed that Wednesday. I didn't actually see what was submitted until that morning. So if we had time, it was simply a matter of hours. If I could, before I address the significance issue with respect to the services DPS policy, let me bring the Court's attention to what I think are two critical determinations from the administrative record. First of all, the Fish and Wildlife Service determined, and this is uncontroverted, the appellants do not dispute this, based upon the administrative record, the best scientific data available, and after applying the ESA Section 4 statutory listing criteria, that the pygmy owl meets the definition of endangered in Arizona. That determination was made in addition to the fact that at the time of listing, there were no more than 22 pygmy owls in Arizona, on the basis of finding that two of the five statutory listing factors were, in fact, present. And I'll simply refer the Court to the Fish and Wildlife Service's final listing rule. Those two factors were, first of all, the historic and ongoing loss, degradation of habitat, as well as the curtailment of species range. And secondly, the fact that there was a lack of adequate regulatory mechanisms protecting the species' habitat. Those findings, again, are not disputed in this case. Secondly, with respect to the pygmy owl's status in Mexico, the Fish and Wildlife Service simply determined that there was insufficient evidence to warrant listing in Mexico. And, in fact, this is precisely what the Service determined in its proposed listing rule. And, again, I'm quoting from the summary, listing is not warranted at this time in its range in Mexico. Once that proposal went out, the appellants had ample opportunity to submit whatever additional information they had, whatever data was out there, to warrant, to suggest that the species warranted listing throughout its entire range, including Mexico. There were three separate public comment periods, hearings. There were dozens of comments submitted. Clearly, the appellants did not submit that information because otherwise it would be in the record. The fact of the matter is that there was simply insufficient evidence available, and to my knowledge there is to this day, to warrant the listing of this species throughout its entire range in Mexico. Well, do they do that in a foreign country? Yes, they do, Your Honor. In fact, a fair number of the species on the list are actually foreign species. So what's the effect when the foreign country doesn't have the power? No, and actually some of the restrictions within the statute, for example, most notably the Section 9 prohibition on the taking of endangered species, only applies in the U.S. That prohibition does not apply overseas. The Fish and Wildlife Service has a policy or regulation that does not apply the Section 7 consultation requirements, which is one of the fundamental protections of the statute, to species overseas. So there are clearly limitations to what the agency can do overseas. I think Congress clearly had that in mind when they enacted the ESA. Well, what does it mean to list it in a foreign country then? Well, that's a good question. Part of what the Endangered Species Act does is it implements our participation in CITES, the Convention on International Trade in Endangered Species. So there are trade restrictions that come into effect when foreign species are listed. Well, part of it is I think it prohibits importation of products made out of those species, right? That's right, and that's through our participation in CITES. I see my time is running up. If I can quickly address the issue of significance. The significance criteria in the DPS policy was not created by Congress. That's a creation of the Fish and Wildlife Service, and specifically it was included in the DPS policy to respond to Congress's admonition, which is in the legislative history, that the DPS authority, the authority to list population segments, should be used sparingly. There was a fair amount of debate, which is actually indicated in the DPS policy, as to whether or not that significance criteria was even authorized by Congress. Nonetheless, it's in there. And I think what's critical, two points are critical. One is that the policy states clearly that the factors that are laid out for significance are not exhaustive. In other words, the Fish and Wildlife Service can consider other factors. One of the factors that clearly they can consider, and this is referenced specifically, was Congress's intent in allowing the services to list population segments. And they reference specifically the Senate Report 96-151, which says, and I'm quoting, for instance, the U.S. population of an animal should not necessarily be permitted to become extinct, simply because the animal is more abundant elsewhere in the world. Now, I would argue that this is precisely the situation Congress intended that authority to be used. Here, it's slightly different. It's not that we had definitive evidence indicating that the pigmy owl is abundant in Mexico. There was simply insufficient evidence to warrant its listing as an endangered species. In light of that, I would argue it would have simply been inappropriate, and in fact, contrary to Congress's intent, for the service to simply say, we're not going to protect the U.S. portion of the species range, even though we have, again, uncontroverted evidence that it's on the brink of extinction, until we actually go out, as the appellants would argue, conduct studies, gather further evidence for us to determine whether or not we've got a definitive determination as to the species status in Mexico. Again, the service did precisely what Congress intended it to do with this authority. Thank you, Your Honor. That's all right. Thank you. Thank you for allowing me some additional time. Let me just highlight a couple of the key arguments here in rebuttal. You've heard a lot about the data, that what is the data, what's there, what isn't there. We believe, Your Honors, that the problem is more fundamental. The problem is a, I don't know how to describe it, other than to just say it's a straight analytical problem. It's not a matter of disagreeing about data. It's clear, we believe, from the face of the listing rule itself, and this is found on, well, I can cite the pages to you, it's on pages 87 of our excerpts of record, and also on page 93 of our excerpts of record, that is the discussion about the distinct population segment issue and the determination, the analysis employed. And we submit, and in fact, again, the district court herself recognized on the record, that once that first step was taken, once it was determined based on the international border that pig meows in Arizona were discrete, that there was simply no attempt made to investigate the significance of that population to the rest of the species. And we submit it's clear on the face of the rule. It's not a situation where, for example, under common administrative law practice, the agency must explain its position. If it's going to deviate from the policy, if it's going to do something different, it needs to, at a minimum, explain that it's deviating. There's no such explanation in this case. The agency makes no bones about the fact that it looked only at Texas and Arizona. And it also says, again, this is the face of the listing rule as opposed to post hoc rationalization that you're hearing today and you saw in the government's brief. In the listing rule itself, the justification was that the loss of the Arizona population would result in a, quote, significant gap in the range of the taxon. And as several of you asked questions about Judge Tashima, what does that really mean? Well, why is a gap important? These may be biological terms, but they're common sense. The reason a gap is important is because you're trying to preserve genetic resources, if you will. If you have a gap in the range of a taxon, a gap in the middle of the range, and we cited examples in our brief, like the California bighorn sheep rule, when you pull out a block of a species that has an elongated range, such as in this case, you disrupt genetic flow. The rest of the species becomes isolated. The population at the north end becomes isolated from the population at the south end because you've pulled the piece out of the middle. That's not what we have here. We don't have that situation. And again, the discussion in the listing rule is... Doesn't the case law support a finding of a peripheral gap? It doesn't have to be a gap in the middle. It can be a peripheral gap is sufficient. I'm not aware of that, Your Honor. I'm not aware of any... Candidly, I'm not aware of any case law dealing with that precise issue. In fact, I'm not aware of any case really dealing with the DPS issue in this sort of context. I know that the Canada lynx case, which is a district court decision, is discussed. But that was a different situation. That was a case where there was an analysis done of the taxon in Canada, the whole range of the taxon, that was then just ignored by the Fish and Wildlife Service when it made its final decision. But I'm not aware that there is any case law, Your Honor, allowing this special treatment of peripheral populations. The bottom line is, and we discussed it in a brief... In fact, we talked about the yellow-legged frog example that my opposing counsel cited, I think makes it very clear that a peripheral population is subject to the same significance test. In that case, again, using that as an example, there were genetic studies. There was genetic evidence. They could say, yes, this is important because the peripheral population is different than the main population, therefore, loss of that population is significant. We don't have that here. There's no genetic studies. The only genetic study in the record looked at the eastern population and compared pigmeows in northeast Mexico to southern Texas. And in that genetic study, Your Honors, they concluded there was no material difference. There is absolutely no genetic study, no evidence, in this record, suggesting that pigmeows in southern Arizona, which are rare, we don't think they're on the verge of extinction, but admittedly they're rare, but they're on the northern fringe of the range. But there's no genetic difference. And where's the evidence of a gap in the western population? That's the issue. There's no gap there. There's a gap with Texas, but there's always been a gap with Texas. There's a 500-mile gap that's always existed. We conclude, therefore, Your Honor, that the rule was arbitrary and capricious. They simply didn't apply their policy. Again, we're not saying that it's impermissible to use the international border. We're not saying that the pigmeow population in Arizona could not conceivably, under a different administrative record, be listed. But this record and this rule on its face is defective. It doesn't meet the test. Thank you. All right. Thank you, Mr. James. We thank all counsel. This case is submitted for decision.
judges: Noonan, Tashima, Wardlaw